AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>VASTY TONINA HOLMAN<br><br>Defendant | FILED<br>CLERK, U.S. DISTRICT COURT<br>12/30/2023<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___GR___ DEPUTY<br><br>Case No. 2:23-mj-06650 |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 29, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Michael Choi
Complainant's signature

Michael Choi, HSI SA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: December 30, 2023

Judge's signature

City and state: Los Angeles, California

U.S. Magistrate Judge Karen L. Stevenson
Printed name and title

AUSA: Derek R. Flores x4896

**AFFIDAVIT**

I, Michael Choi, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against Vasty Tonina HOLMAN, for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.  This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in Attachment A: one white iPhone seized from HOLMAN's person when she was arrested on December 30, 2023.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND OF AFFIANT

5.   I am a Special Agent with HSI and have been since March 2020.  I am currently assigned to the office of the Assistant Special Agent in Charge Los Angeles International Airport ("LAX") office where I am assigned to investigate a range of crimes to include money laundering, extortion, and other violent crime related violations.

6.   My formal education consists of a bachelor's degree from Columbia University and a certificate in continuing legal education from Georgetown University.  From May 2021 to September 2021, I attended the HSI Special Agent Academy, a criminal investigations academy conducted at the Federal Law Enforcement Training Center located in Brunswick, Georgia.  At the HSI Academy, I was trained in all aspects of conducting criminal investigations and received several hundred hours of comprehensive, formalized instruction for investigating violations of customs and immigration law, to include offenses involving drug trafficking, money laundering and conspiracy.

7.   As an HSI Special Agent, I have received training in the areas of arrest procedures, the execution of searches and seizures, and various other criminal laws and legal procedures.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with

2

informants, and the execution of search and arrest warrants. Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the investigations in which I have been involved.

8. Based on my training and experience, I am familiar with the methods of operation that narcotics traffickers utilize, including the distribution, storage, and transportation of narcotics and the collection of narcotic related proceeds from drug trafficking and various methods of money laundering used to conceal the nature of the proceeds. Additionally, I have participated in many aspects of drug investigations alongside experienced senior agents and task force officers.

### III. SUMMARY OF PROBABLE CAUSE

9. On December 29, 2023, Vasty Tonina HOLMAN was attempting to travel from LAX to Tahiti International Airport via Air Tahiti on flight TN 101, which was scheduled to depart at approximately 10:55 p.m. During security screening, she placed her carry-on roller bag on the x-ray machine conveyor belt and the TSA officers identified anomalies in her bag on the x-ray images.

10. TSA searched her bag and found four socks containing a crystalline substance that later field tested positive for methamphetamine. The four socks and the crystalline substance weighed a total of approximately 823 grams.

11. HOLMAN told law enforcement that the bag was hers and that she packed the bag herself. The bag also contained various clothes that were consistent with HOLMAN's body size and shape.

3

## IV. STATEMENT OF PROBABLE CAUSE

12.  Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I know the following facts:

### A. HOLMAN Attempts to Smuggle Methamphetamine Through TSA Screening Inside of her Carry-On Bag

13.  At approximately 8:05 p.m. on December 29, 2023, TSA Transportation Security Officer ("TSO") Valeriya Borisova Cancelmo was working the x-ray machine at the Tom Bradley International Terminal security screening checkpoint when HOLMAN placed her carry-on roller bag on the x-ray machine conveyor belt. HOLMAN is a resident of French Polynesia and was scheduled to depart on Air Tahiti flight TN 101 to Tahiti International Airport at 10:55 p.m.

14.  TSO Cancelmo reviewed thew x-ray images of HOLMAN's bag and saw what appeared to socks with masses concealed inside them. TSO Cancelmo asked HOLMAN what it was and HOLMAN said that it was just clothes. TSO Cancelmo then opened the main compartment of HOLMAN's carry-on roller bag and found various clothes consistent with HOLMAN's body size and shape. TSO Cancelmo also found socks with a crystalline substance inside them as shown below in pictures later taken by law enforcement.




15.    TSO Cancelmo called her supervisor, TSO Rajul Grooms. TSO Grooms examined the socks and agreed that they contained a crystalline substance. TSO Grooms then contacted the airport coordination center to request a bomb technician as well as the TSA manager on duty, Joan Arruabarrena.  Manager Arruabarrena notified LAXPD.

16.    TSA bomb technician Juan Rodriguez arrived and examined the crystalline substance inside the socks. Rodriguez removed a piece of the substance from one of the socks and tested it with a chemical analysis device, which was a negative hit for any explosives but tested positive for methamphetamine.

**B.    HOLMAN Tells Law Enforcement that the Bag Was Hers**

17.    At around 9:14 p.m., LAXPD notified HSI of the incident and arrived at around 10:00 p.m. LAXPD told the HSI

5

agents that HOLMAN had stated that the carry-on belonged to her and that she packed the carry-on herself. As noted above, HOLMAN's carry-on bag also contained various clothes consistent with HOLMAN's body size and shape.

   18.  HSI then field-tested the crystalline substance that was in HOLMAN's bag using a ThermoFisher Gemini. The test indicated that the substance was positive for methamphetamine. The total weight of the four socks and drugs was approximately 823 grams as shown below.[1]



---

[1] As seen in the image, this weight includes the four socks that contained the drugs. Law enforcement has not yet weighed the drugs without the socks because the drugs were loosely packed within the socks (i.e., there was no plastic wrap or other packaging material around the drugs other than the socks).

6

## V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES

19.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

7

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

20. As used herein, the term "digital device" includes the SUBJECT DEVICE.

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

8

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

24. For all the reasons described above, there is probable cause to believe that HOLMAN has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  30th  day of
December, 2023.

*[signature: Karen L. Stevenson]*

HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE